## STATE v. STEVEN LEE MOLLBERG.

246 N. W. 2d 463.

October 1, 1976—No. 45841.

*C. Paul Jones,* State Public Defender, and *Robert J. McNulty, Jr.,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Richard G. Mark,* Assistant Solicitor General, *Edward M. Laine,* Special Assistant Attorney General, and *John R. Krouss,* County Attorney, for respondent.

Heard before Rogosheske, MacLaughlin, and Marsden, JJ., and considered and decided by the court en banc.

MACLAUGHLIN, JUSTICE.

Defendant, Steven Mollberg, was found guilty by a jury in Lake of the Woods County District Court of unlawful possession

of marijuana. Defendant appeals from the judgment of conviction on the grounds (1) that the trial court erroneously admitted the marijuana into evidence, (2) that the trial court improperly threatened to impose the maximum sentence if defendant did not plead guilty, and (3) that the state failed to show beyond a reasonable doubt that defendant was in possession of the marijuana. We affirm the conviction.

On April 22, 1974, Conservation Officer Harland Pickett applied for and obtained a warrant to search the residence of Paul Wade Peterson for a fresh deerskin. After securing the warrant, Officer Pickett enlisted Dennis Bollman, a state highway trooper, Emil Spina, a deputy sheriff, Allen Markovich, a conservation officer, and Larry Toll, a Baudette policeman, to assist him in executing the warrant. At 4:30 p. m. on April 23, 1974, the officers executed the warrant at the Peterson residence, which was located in Zippel township, several miles from the nearest municipality. Officers Pickett and Bollman knocked on the door of the house and were invited into the kitchen by one Michelle Maus, who was apparently a visitor at the Peterson residence. While Officer Pickett was reading the search warrant to Ms. Maus, Officer Bollman stood in the kitchen doorway approximately 5 to 6 feet away from a refrigerator which was directly in front of him. While standing there, Officer Bollman observed some marijuana in plain view on top of the refrigerator. Bollman informed Pickett and Spina of his discovery and confiscated the contraband. Bollman and Spina then proceeded into the living room where Bollman observed in plain view certain marijuana paraphernalia. While Bollman was confiscating this paraphernalia, Spina proceeded to search an adjacent bedroom. Spina testified that at this point he was searching for "drug-type materials." In the bedroom Spina found numerous envelopes scattered on the floor all addressed to defendant. Spina also found the front end of a motorcycle which was later determined to belong to defendant. Spina then searched a bedroom closet wherein he found a brown bag containing numerous small bags of

marijuana. After further searching of the premises Pickett finally found a deerskin in a barrel near the driveway of the house. This deerskin, however, was not fresh and no arrest was made for violation of the game laws. When the officers left, they failed to leave a copy of the search warrant at the premises.

Defendant and Peterson were subsequently arrested the same day about 6 miles from the city of Baudette. The next day while defendant was in jail, he was served with a copy of the search warrant and inventory. Defendant moved to suppress the marijuana on the ground that the search was illegally executed and constitutionally invalid. At the Rasmussen hearing, the prosecutor stipulated that the original search warrant and inventory could not be found in the file. However, Officer Pickett testified that he was certain that he returned the warrant to the court. The trial court denied defendant's motion.

At the end of the first day of trial and after the jury had left, the district court judge requested that counsel remain in the courtroom. Defendant requested and was allowed to remain present during the ensuing discussion. The trial court judge discussed with the attorneys the subject of "some sort of a plea bargain." The judge noted the possible prejudice of some of the jurors and the likelihood of defendant's conviction. The judge then stated that if defendant was convicted that he would "probably have to impose a maximum sentence." Defendant's motion for a mistrial on the grounds of judicial misconduct was denied and defendant was subsequently convicted. Before pronouncing sentence the trial court ordered and reviewed a presentence report and listened to defense counsel's arguments on defendant's behalf. The court then sentenced defendant to 0 to 3 years in prison and fined him $500. However, the court stayed this sentence on the condition that defendant serve 6 months in the county jail under the provisions of the so-called Huber Law, Minn. St. 631.425.

The issues raised on this appeal are: (1) Whether the affidavit for the search warrant contained sufficient reliable facts to support the issuance of a search warrant; (2) whether the seizure

of the marijuana in the bedroom closet was a lawful seizure under the Fourth Amendment; (3) whether the defects in the execution of the search warrant in this case require the suppression of evidence; (4) whether the trial court's statements regarding the probability that defendant would receive the maximum sentence if he was convicted require a new trial; and (5) whether there was sufficient evidence to show that defendant was in constructive possession of the marijuana.

■ Defendant's initial argument is that the affidavit in support of the search warrant did not contain sufficient underlying facts and circumstances to enable the issuing judge to determine whether there was probable cause to search the Peterson residence. The affidavit stated:

"That the facts tending to establish the grounds for issuance of a search warrant are as follows: That Harland C. Pickett received a report in the regular course of his duties as Conservation Officer for the Department of Natural Resources, State of Minnesota, that a fresh deer skin was situated on the above described premises and was seen by one Jerome Krohn, age 16, of Lake of the Woods County, Minnesota; that applicant interviewed said Jerome Krohn and has been acquainted with him personally; that he has reason to believe and does believe that Jerome Krohn is fully competent to recognize and identify the hide of white tail deer and that the said Jerome Krohn is fully competent to determine whether a hide is in fresh condition or not; and furthermore, applicant from his own knowledge of Jerome Krohn stated that he has reason to believe and does believe the said Jerome Krohn is telling the truth. That Jerome Krohn stated that he observed the skin of a deer in a barrel situated on the premises and further observed that the condition of the skin was fresh, such that it could not have been from a deer taken during any open season; that applicant knows and is familiar with the laws and Commissioners regulations pertaining to the taking of animals in the State of Minnesota and knows

that it is unlawful at this date to possess skin of a freshly killed deer."

In Aguilar v. Texas, 378 U. S. 108, 114, 84 S. Ct. 1509, 1514, 12 L. ed. 2d 723, 729 (1964), the United States Supreme Court set forth a two-pronged test by which to assess the sufficiency of a search warrant affidavit:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observation of the affiant [citation omitted], the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed [citation omitted], was 'credible' or his information 'reliable.' "

Concerning the first part of the test, the Supreme Court in Spinelli v. United States, 393 U. S. 410, 416, 89 S. Ct. 584, 589, 21 L. ed. 2d 637, 644 (1969) (plurality opinion) explained that it was important that the magistrate know how the informant obtained the information so that "the magistrate may know that he is relying on something more substantial than a casual rumor." In the instant case the affidavit clearly states that the informant, Jerome Krohn, personally—

"* * * observed the skin of a deer in a barrel situated on the premises and further observed that the condition of the skin was fresh, such that it could not have been from a deer taken during any open season."

In State v. Daniels, 294 Minn. 323, 328, 200 N. W. 2d 403, 406 (1972), this court stated:

"* * * [P]ersonal observation satisfies that part of the Aguilar test which requires that the affidavit contain facts to enable the magistrate to judge whether the informant obtained his knowledge in a reliable manner."

See, also, State v. Phelps, 297 Minn. 61, 209 N. W. 2d 780 (1973). Thus, there is no question that the affidavit in the instant case satisfies the first part of the Aguilar test since it clearly indicates that the informant obtained his information in a reliable manner.

It is also clear that the affidavit satisfies the second part of the Aguilar test since it contains sufficient information to show that the informant was credible. First, and most important, the affidavit specifically identifies the informant by name. In State v. Lindquist, 295 Minn. 398, 400, 205 N. W. 2d 333, 335 (1973), this court observed that "[o]ne who voluntarily comes forward and identifies [himself] is more likely to be telling the truth because [he] presumably knows that the police could arrest [him] for making a false report." Second, there is no indication that the informant, Jerome Krohn, was involved in the criminal activity reported and thus no reason to suspect his motives. See, State v. Phelps, *supra*. Finally, the affidavit identifies Jerome Krohn as a 16-year-old youth whom Officer Pickett personally knew. On the basis of these facts there was no reason for the issuing judge to suspect that Jerome Krohn was not telling the truth. Therefore, we hold that the affidavit in the instant case contained sufficient facts to support the issuance of the search warrant.[1]

■ The second and perhaps most difficult issue in this case is whether the seizure of the marijuana in the bedroom closet was constitutionally valid. We initially note that the fact that the officers had a search warrant does not automatically justify the search of the bedroom closet. As stated in United States v. Micheli, 487 F. 2d 429, 432 (1 Cir. 1973):

"* * * It should not be assumed that whatever is found on

---

[1] Because the affidavit was itself sufficient to support the issuance of the search warrant, there is no need to consider defendant's claim that the trial court in assessing the validity of the warrant relied on facts not before the issuing judge.

the premises described in the warrant necessarily falls within the proper scope of the search * * *."

Rather, a search is limited in scope to those areas where one would reasonably expect to find the items identified in the search warrant. In the instant case one would not reasonably expect to find fresh deerskin in the back of a bedroom closet. In fact, the officer who searched the closet candidly conceded that he was searching for "drug-type materials" at the time he searched the closet. Consequently, the trial court did not attempt to justify the search of the closet on the theory that the officer was still looking for evidence relating to an illegally taken deer.

The purported justification for the search of the bedroom closet was that the officers had previously discovered some marijuana in the kitchen.[2] The question, then, is whether the officers, having discovered the marijuana in the kitchen, were justified in proceeding to search the entire premises for drugs without first securing a search warrant specifically authorizing a search for marijuana.

The Supreme Court stated in Coolidge v. New Hampshire, 403 U. S. 443, 454, 91 S. Ct. 2022, 2032, 29 L. ed. 2d 564, 576 (1971)—

"* * * the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' "

It was also recognized that there is no need to obtain a warrant if (1) there is probable cause for the search, and (2) there are

---

[2] There is no question in this case that the officers properly seized the marijuana in the kitchen since such a seizure clearly falls within the "plain view" doctrine as described in Coolidge v. New Hampshire, 403 U. S. 443, 465, 91 S. Ct. 2022, 2037, 29 L. ed. 2d 564, 582 (1971):

"An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character."

exigent circumstances requiring immediate action. See, also, Roaden v. Kentucky, 413 U. S. 496, 93 S. Ct. 2796, 37 L. ed. 2d 757 (1973). In the instant case there is no question that, once having observed the marijuana on the refrigerator and the marijuana paraphernalia in the living room, the officers had probable cause to search the premises for drugs. The only question is whether exigent circumstances justified an immediate and warrantless search of the Peterson residence.

It is well established that exigent circumstances exist if "contraband [is] threatened with removal or destruction." Johnson v. United States, 333 U. S. 10, 15, 68 S. Ct. 367, 369, 92 L. ed. 436, 441 (1948); United States v. Blair, 366 F. Supp. 1036, 1039 (1973). Whether the exigencies of a situation are sufficient to allow a warrantless search "depends upon the totality of the circumstances." United States v. Evans, 481 F. 2d 990, 993 (9 Cir. 1973).

Applying these principles to the instant case, it appears that at the time the officers discovered the marijuana in the kitchen they were confronted with the facts that Michelle Maus was present in the house and that they did not know the whereabouts of defendant or Peterson. The house was located several miles from the nearest municipality and there was no assurance a magistrate would be available in that municipality to issue a warrant. In assessing this situation the trial court concluded:

"* * * It does not take much imagination to predict that had the officers picked up the evidence in plain sight and then returned to get a search warrant for further marijuana, or other controlled substances or paraphernalia, they would not have found much upon their return to the premises in question."

We concur in the trial court's assessment and conclude that there were exigent circumstances requiring immediate action on the part of the officers to preserve the evidence. Therefore, we hold that the search was justified and reasonable under the circumstances of this case.

■ Defendant argues that the officers improperly executed the search warrant at the Peterson residence because (1) they failed to leave a copy of the warrant at the premises as required by Minn. St. 626.16, and (2) they failed to properly return the warrant and inventory to the court after the search as required by Minn. St. 626.17. The issue is whether these defects in the execution and return of the warrant require suppression of the marijuana seized at the Peterson residence. Initially we note that although a copy of the warrant was not left at the Peterson residence, defendant was served with a copy of the warrant the day after the search. In addition, the trial court found that the officers did return the warrant and inventory to the court but that the original was somehow misplaced and never filed. Thus, although there were defects in the execution of the warrant, these defects were minor and technical in nature.

In Cady v. Dombrowski, 413 U. S. 433, 93 S. Ct. 2523, 37 L. ed. 2d 706 (1973), the Supreme Court considered the effect of a technical defect in the execution of a search warrant. There, a Wisconsin police officer failed to recite in the application for a search warrant certain items subsequently seized, and failed to indicate these items, a sock and an automobile floor mat, in the return. The court rejected the contention that the defective return rendered the underlying search invalid under the Fourth Amendment (413 U. S. 449, 93 S. Ct. 2532, 37 L. ed. 2d 719):

"* * * The seizures of the sock and the floor mat occurred while a valid warrant was outstanding, and thus could not be considered unconstitutional * * *. As these items were constitutionally seized, we do not deem it constitutionally significant that they were not listed in the return of the warrant."

The implication in the court's holding is that relatively minor irregularities in the execution of a search warrant which occur after a valid search and seizure are not "constitutionally significant" and will not retroactively render the evidence seized inadmissible. The irregularities in the instant case were minor and clearly occurred after the search and seizure.

Defendant argues, however, that Minn. St. 626.21 requires suppression of evidence on the ground that "the warrant was illegally executed."[3] Minn. St. 626.21 provides in part:

"A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized or the municipal court having jurisdiction of the substantive offense for the return of the property and to suppress the use, as evidence, of anything so obtained on the ground that (1) the property was illegally seized, or (2) the property was illegally seized without warrant, or (3) the warrant is insufficient on its face, or (4) the property seized is not that described in the warrant, or (5) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (6) *the warrant was illegally executed,* or (7) the warrant was improvidently issued." (Italics supplied.)

While the statute suggests that suppression may be a proper remedy for an "illegally executed" warrant, the term "illegally executed" is not defined and could refer to many types of irregularities of varying degrees of significance. In an analogous situation the court in United States v. Hall, 505 F. 2d 961 (3 Cir. 1974), addressed the question of whether suppression is the appropriate remedy for an officer's failure to adhere to proper procedure in executing a search warrant under Rule 41(d) of the Federal Rules of Criminal Procedure. The court concluded:

"* * * [W]e do not believe that it was intended that every violation of the procedures in the rule, however insignificant and

---

[3] The trial court concluded that the provisions of Minn. St. c. 626 were not applicable to a search warrant issued under Minn. St. 97.50. However, Minn. St. 97.50, subd. 1, clearly states that conservation officers are "authorized and empowered to execute and serve all warrants * * * in the same manner as any constable or sheriff may do so." Since peace officers (defined in Minn. St. 626.05, subd. 2, as sheriffs, deputy sheriffs, policemen, or constables) are obliged to adhere to the procedures contained in Minn. St. c. 626, presumably conservation officers are also so obliged. We see no statutory or policy justifications for excepting conservation officers from the requirements of Minn. St. c. 626.

however lacking in consequences, should give rise to the remedy of suppression. If such had been the intent, we think the rules would have specifically so provided. * * * Therefore, we conclude, along with the Sixth and Tenth Circuits, that a motion to suppress, Rule 41(f), F.R.Cr.P., should be granted by the district court only when the defendant demonstrates prejudice from the Rule 41(d) violation." 505 F. 2d 964.

See, United States v. McKenzie, 446 F. 2d 949 (6 Cir. 1971); United States v. Kennedy, 457 F. 2d 63 (10 Cir.), certiorari denied, 409 U. S. 864, 93 S. Ct. 157, 34 L. ed. 2d 112 (1972). We fully agree with the approach adopted by the Federal courts. In the instant case defendant does not allege that the irregularities resulted in any prejudice to him. Therefore, we hold that suppression of the evidence is not an appropriate remedy for the technical and nonprejudicial irregularities in the execution of the search warrant in the instant case.

■ Defendant's next contention is that certain statements of the trial court judge made after the first day of trial constituted judicial misconduct and denied defendant a fair trial. While these statements were made off the record, the trial judge stated for the record his recollection of his comments. Essentially, the trial judge discussed with counsel in defendant's presence the subject of "some sort of a plea bargain" because it was the trial judge's belief that defendant would likely be convicted by the jury, and that if defendant was convicted he would "probably have to impose a maximum sentence." Defendant elected to stand trial. After the jury found defendant guilty the trial judge sentenced defendant to 0 to 3 years in prison and fined him $500, but then stayed sentence on the condition that defendant serve 6 months in the county jail under the provisions of the so-called Huber Law, Minn. St. 631.425. The maximum sentence the trial judge could have imposed was 3 years in prison and a fine of $3,000.

Defendant first asserts that he is entitled to a new trial because of the trial judge's remarks. We note, however, that aside from a vague allegation by defendant's attorney that the judge's

remarks upset defendant, defendant has made no concrete showing of prejudice. The remarks were made out of the presence of the jury, and defendant specifically requested to be present during the discussion.

Defendant next contends that he is entitled to have his sentence vacated. It is well established that the fact that a "defendant exercises his constitutional right to trial by jury to determine his guilt or innocence must have no bearing on the sentence imposed." Hess v. United States, 496 F. 2d 936, 938 (8 Cir. 1974), United States v. Hopkins, 150 App. D. C. 307, 464 F. 2d 816 (1972). The difficult question is determining on the facts of each case whether a trial judge did impose a harsher sentence because a defendant elected to stand trial. In United States v. Stockwell, 472 F. 2d 1186 (9 Cir.), certiorari denied, 411 U. S. 948, 93 S. Ct. 1924, 36 L. ed. 2d 409 (1973) the court was confronted with facts similar to those in the instant case. In Stockwell the district judge told the defendant that if he were to plead guilty to one count he would receive a 3-year sentence, as did a codefendant who pled guilty. The court added that if the defendant chose to stand trial and was convicted he would receive a sentence of from 5 to 7 years. The defendant elected to stand trial. He was convicted and given concurrent sentences of 7 years for the 5 counts of which he was found guilty. Based on these facts the Court of Appeals remanded the case for resentencing, concluding that (472 F. 2d 1188) :

"* * * In such a case, the record must affirmatively show that the court sentenced the defendant solely upon the facts of his case and his personal history, and not as punishment for his refusal to plead guilty."

We conclude that the record in the instant case does "affirmatively show" that the trial judge did not use the sentencing power to punish defendant for exercising his right to stand trial. First, the trial judge did not impose the maximum sentence on defendant. Although defendant's sentence was more severe than the sentence given his accomplice, Peterson, Peterson was convicted

of a misdemeanor whereas defendant was convicted of a felony. Second, the record discloses that the trial judge properly considered the facts of the case and defendant's personal history in the sentencing decision. Specifically, the trial judge noted that his sentencing decision was adversely affected by the fact that there was a large amount of marijuana involved which was packaged for resale, and by the fact that the presentence report stated that the defendant had not decided to stop using marijuana. Finally, it is clear from the record that the judge did not indicate he would impose the maximum sentence because defendant exercised his right to stand trial, but rather because the judge felt that his responsibility to the community required him to impose a severe sentence for a felony drug conviction. Faced with this responsibility and his opinion that defendant would most likely be convicted by the jury, the trial judge decided that it would be in defendant's best interest to inform defendant's counsel so that he could properly assess the risks of standing trial. Indeed, after staying defendant's sentence the judge stated that the community "will be disappointed at the leniency of this sentence" but that the interests of defendant required such a sentence. Thus, when the record is viewed in its entirety it is clear that the trial court acted fairly and properly in sentencing defendant.

■ Defendant's final argument is that the prosecution failed to show beyond a reasonable doubt that defendant was in constructive possession of the marijuana in the bedroom closet and that therefore his conviction must be reversed. This court will not reverse a jury verdict on appeal unless the jury could not have reasonably found the defendant guilty. State v. Norgaard, 272 Minn. 48, 136 N. W. 2d 628 (1965). Thus, the issue is whether, upon viewing the evidence in the light most favorable to the jury verdict, the jury could have reasonably found that defendant was in constructive possession of the marijuana in the bedroom closet.[4] State v. Loss, 295 Minn. 271, 204 N. W. 2d

---

[4] It is clear that defendant was not in actual possession of the marijuana.

390

404 (1973); State v. Wiley, 295 Minn. 411, 205 N. W. 2d 667 (1973); State v. Hansen, 283 Minn. 502, 169 N. W. 2d 48 (1969).

In State v. Florine, 303 Minn. 103, 105, 226 N. W. 2d 609, 611 (1975), this court stated:

"* * * [W]e believe that in order to prove constructive possession the state should have to show (a) that the police found the substance in a place under defendant's exclusive control to which other people did not normally have access, or (b) that if police found it in a place to which others had access, *there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it.*" (Italics supplied.)

We conclude, upon viewing the evidence in the instant case in the light most favorable to the verdict, that it establishes a "strong probability * * * that defendant was at the time consciously exercising dominion and control" over the marijuana in the bedroom closet. The evidence shows that defendant frequently stayed at the Peterson residence, that there were numerous letters addressed to defendant scattered on the floor of the bedroom, that the front end of defendant's motorcycle was found in the bedroom, and that defendant was observed numerous times after the search riding this motorcycle. While defendant had not actually stayed at the Peterson residence for the few days immediately prior to the search, he was expected to return to the residence the day of the search. Based on this evidence the jury could have reasonably concluded that defendant was in constructive possession of the marijuana. Therefore, we affirm the conviction.

Affirmed.